UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

ESTEBAN GERONIMO,

                    Petitioner,

  - against -

WARDEN R. RUSHING,

                    Respondent.

--------------------------------------------------------------------x

ESTEBAN GERONIMO,

                    Petitioner,

  - against -

UNITED STATES,

                    Respondent.

--------------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
11-CV-1121(CBA)

14-CV-2221(CBA)

**AMON, Chief United States District Judge.**

On April 29, 2011, petitioner Esteban Geronimo, proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, seeking to vacate his federal conviction of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine. Geronimo subsequently filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 based on many of the same arguments as those made in his § 2255 petition. For the reasons that follow, the Court construes Geronimo's § 2241 petition as an amendment to his initial § 2255 petition, and denies the petitions for a writ of habeas corpus.

## BACKGROUND

### I.  Indictment and Pre-Trial Hearing

Drug Enforcement Administration ("DEA") agents arrested Geronimo, along with his co-conspirators Ramon Veras and Jorge Rodriguez, on January 12, 2006, after the three men attempted to purchase 20 kilograms of cocaine from a paid informant.  The grand jury indicted Geronimo on February 13, 2006, charging him and his co-defendants with conspiracy to distribute and possess with intent to distribute five kilograms or more of a substance containing cocaine.  On March 10, 2006, the grand jury returned a superseding indictment containing the same charges as the first.

On April 25, 2006, Geronimo moved to suppress evidence seized at the time of his arrest and to suppress his post-arrest statements, claiming that the evidence was seized in violation of the Fourth Amendment because there was no probable cause for the arrest.  The Court conducted an evidentiary hearing on July 17, 2006.  At the hearing, DEA Special Agent Jefferson Moran testified as to the events surrounding Geronimo's arrest on January 12, 2006.  In particular, Agent Moran testified that on January 12, 2006, a DEA informant planned to meet with Veras and other individuals, at which time Veras and the other individuals would give the informant a down payment of $50,000 to purchase 20 kilograms of cocaine.  (Mem. of Law in Opp. to Esteban Geronimo's Petition Pursuant to 28 U.S.C. § 2255 ("Gov't Opp."), Ex. A ("Suppression Hr'g Tr.") at 9.)  The informant had previously met with Veras and other individuals on two occasions to discuss the details of the transaction: on December 14, 2005, Agent Moran was part of a surveillance team that oversaw a meeting between the informant, Veras, and an unknown individual, where the informant arranged to sell cocaine to Veras and the other individual; and on January 10, 2006, Agent Moran was again part of a surveillance team that oversaw a meeting

between the informant, Veras, Rodriguez, and one unknown individual. (Id. at 5-6.) Both the December 14, 2005 and January 10, 2006 meetings were recorded, and Moran testified that the recordings of these meetings confirmed the informant's description of the meetings. (Id. at 6, 8.) Geronimo was only observed at the January 12, 2006 meeting, when the down payment was to be provided to the DEA informant. (Id. at 22.)

Agent Moran testified that he was part of the surveillance team overseeing the third meeting on January 12, 2006, and that Veras, Rodriguez, and Geronimo met the informant at Victor's Cafe in Huntington, New York. (Id. at 8-9.) Prior to this meeting, it was arranged that the informant would call Agent Moran when he saw the down payment for the transaction. (Id. at 9.) Agent Moran testified that he saw the informant and Veras leave the cafe and go into a silver Saturn that, as determined later, was registered to Geronimo. (Id. at 10-11, 31.) Geronimo and Rodriguez were subsequently called to join Veras and the informant at the car. (Id. at 31.) Agent Moran testified that another member of the DEA field team, Investigator Kenneth Cozza, who had a better visual perspective, saw Geronimo open the trunk of the vehicle and show the informant the contents of the trunk. (Id. at 10-11.) The informant then called Agent Moran and told him that he had seen the money inside the trunk of the vehicle. (Id. at 11.) Agent Moran testified that, at this point, his team arrested Geronimo and his two codefendants and searched the car, recovering $29,990 from the trunk of the car. (Id. at 11-12.) Geronimo was taken to DEA headquarters where Agent Moran testified that Geronimo signed a waiver of his Miranda rights and admitted to being involved in the drug transaction. (Id. at 12-16.)

On cross-examination, Agent Moran testified that, during the December 14, 2005 meeting, officers had observed the same silver Saturn that was at the January 12, 2006 meeting. (Id. at 18.) Agent Moran, however, immediately corrected this testimony, stating that the silver

Saturn had not in fact been observed at the December 14, 2005 meeting. (Id. at 20.) Further, when asked if he saw Geronimo at the second meeting on January 10, 2006, he testified that he had. (Id. at 21.) Moran again corrected this testimony almost immediately, stating that he had only seen Geronimo on the day of the arrest—January 12, 2006. (Id. at 22.)

Counsel for Geronimo, Barry Weinstein, also attempted to establish during the hearing that the information contained in the complaint regarding statements made by Geronimo on January 12, 2006 were inconsistent with the recording of the meeting. (Id. at 28-29.) The Court noted at this time that because Geronimo was arrested at the scene, the relevant facts in determining probable cause were those known to the officers at the time of the arrest, not what was stated in the complaint. (Id. at 19-20.) Counsel for Geronimo further attempted to establish that Geronimo was not the individual who opened the trunk, (id. at 30-31), and that the voice Agent Moran heard counting the money on the recording of the January 12, 2006 meeting was not Geronimo's voice, but rather the informant's, (id. at 40). At the conclusion of the hearing, the Court noted that it was undisputed that, at the time of the arrest, the DEA agents knew that Geronimo was with at least one other individual who was previously involved in a drug deal, that the confidential informant had called Detective Moran and stated that the money was in the trunk of the car, and that the $29,990 payment for the cocaine was found in the trunk of Geronimo's car. (Id. at 45-48.) The Court subsequently denied Geronimo's motion to suppress.

## II.    Trial and Conviction

Geronimo went to trial on July 24, 2006. Magistrate Judge James Orenstein conducted jury selection. At the start of jury selection, Magistrate Judge Orenstein asked counsel during a sidebar if they consented to having a magistrate judge preside over jury selection. (Gov't Opp.,

Ex. E ("Jury Selection Tr.") at 5.) Counsel for Geronimo and the government both provided consent. (Id.)

At trial, defense counsel for Geronimo, David Goldstein, argued that Geronimo was not involved in the drug transaction and was only present at the January 12, 2006 meeting because he agreed to give Veras and Rodriguez a ride that day. (Trial Tr. at 455.) The government argued that Geronimo had in fact been involved in the drug transaction and, indeed, had agreed to finance the transaction with the approximately $30,000 found in the trunk of his car. (Id. at 20.)

During the trial, the government's main witnesses—aside from two members of the DEA field team—were the paid government informant, identified as Hugo Cartagena, and Geronimo's co-conspirator Ramon Veras (also known as "Pachuco"), who had pleaded guilty to the events of January 12, 2006 and was cooperating with the government. Cartagena had worked with the government for several years, first as a cooperator and then as an informant. In the instant case, Cartagena had led Geronimo and his co-defendants to believe that he intended to sell approximately 20 kilograms of cocaine to them. Cartagena testified that he met with Veras on December 14, 2005 to discuss the sale of cocaine, and then again on January 10, 2006, at which time Veras agreed to purchase the cocaine for $150,000. (Id. at 131-32, 139.) He testified that on January 12, 2006, he met Veras, Rodriguez, and Geronimo at Victor's Cafe to carry out the transaction. (Id. at 141-45.) After arriving, Cartagena and Veras went out to the parking lot and sat in Geronimo's car, where Veras informed Cartagena that he only had $30,000, instead of the agreed upon $50,000 down payment. (Id. at 146-48.) Cartagena subsequently asked to see the money and Veras called Rodriguez and Geronimo, who were still inside the restaurant, to come

out to the car. (Id. at 149-51.) Geronimo then opened the trunk and showed Cartagena the money. (Id. at 152-54.)

The government also played excerpts of the audio recording of the January 12, 2006 meeting and asked Cartagena to explain certain aspects of the recording and the corresponding transcript. (Id. at 162-73.) Cartagena testified that when he was shown the money in the trunk, he asked Geronimo how the money was organized. (Id. at 170.) In response, unidentified male 2 ("UM2"), who Cartagena identified as Geronimo, said "in five and five."[1] (Id. at 170-71.)

Veras testified that, after he initially arranged to do the deal with Cartagena, he and Rodriguez attempted to raise the necessary funds for the transaction. (Id. at 252-53.) Veras testified that Rodriguez introduced him to Geronimo, who agreed to finance the transaction. (Id. at 253-55.) Veras testified that before meeting Cartagena on January 12, 2006, Geronimo picked up Veras and Rodriguez, and then they went to Geronimo's house so he could retrieve the money for the transaction, which he placed in the trunk of the car. (Id. at 272-73.) He testified that once they met Cartagena at Victor's Cafe, he asked Geronimo for his car keys and went out to the car with Cartagena to discuss the transaction. (Id. at 277.) Veras subsequently called Geronimo and Rodriguez to come outside to show Cartagena the money, at which time Geronimo came out to the car, opened the trunk by using a button located on the driver's side of the car, and showed the money to Cartagena. (Id. at 280-81.) Investigator Cozza—a member of the DEA field team who was present at the January 12, 2006 meeting between Cartagena, Geronimo, Veras and Rodriguez—similarly testified that he saw Geronimo go to the trunk of the car with Cartagena, open the trunk of the car, and show Cartagena the contents of a box inside the trunk. (Id. at 354-55.)

---

[1] It appears that the recording was in Spanish and that Geronimo stated something to the effect of "de cinco en cinco," which was translated into English in the transcript. (Id.)

At the close of the government's case, Geronimo's counsel moved for a judgment of acquittal under Rule 29, arguing that the government failed to prove a prima facie case of the charged crime. (Id. at 377.) The Court denied the motion based on the testimony of Cartagena and Veras that directly implicated Geronimo in the conspiracy, and testimony elicited from one of the detectives on the surveillance team who placed Geronimo at the trunk showing the money to be used for the transaction. (Id. at 378.)

During the defense's case, Geronimo did not testify but counsel for Geronimo called three witnesses: (1) a private investigator, who testified as to how the trunk on Geronimo's vehicle functioned; (2) another member of the DEA field team, Agent Moran; and (3) Geronimo's wife. During summations, counsel for Geronimo argued that Geronimo was only present at the transaction on January 12, 2006 because he gave Veras and Rodriguez a ride, but was not involved in the drug transaction. (Id. at 455.) He argued that Geronimo had not opened the trunk to show Cartagena the money (id.), and that Geronimo's voice was not on the recording of the January 12, 2006 meeting, (id. at 457). In support of these arguments, defense counsel noted, among other things, inconsistencies between the different testimony regarding who opened the trunk to show Cartagena the money and how the trunk was opened, and that Veras and Cartagena discussed the deal for several minutes without any mention of Geronimo, who was supposedly financing the transaction. He further noted that the transcript of the January 12, 2006 transaction indicated that an individual other than Veras or Cartagena explained how the money for the transaction was organized ("in five and five"), but that the translator's only basis for believing that it was another individual was that the individual had a high-pitched voice. (Id. at 457.) Counsel for Geronimo, however, highlighted the testimony of Geronimo's wife, who had stated that Geronimo did not have a high-pitched voice. (Id.)

On July 28, 2006, the jury found Geronimo guilty of the sole count of conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine.

## III.    Motion for a New Trial

On October 23, 2006, Geronimo requested that his trial counsel, Goldstein, be permitted to withdraw because Geronimo was not satisfied with how he conducted his defense at trial. (See United States v. Geronimo, No. 06-CR-0087(CBA), Docket Entry ("D.E.") # 145.) The Court held a status conference on October 26, 2006, at which time Goldstein was relieved as Geronimo's counsel, and new counsel Raymond Colon was appointed. (Id. D.E. # 146.) Geronimo, through his new counsel, moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure on December 29, 2006, on the basis that Goldstein did not permit him to testify. (Id. D.E. # 161.) At this time, Colon indicated that he would not make a Rule 29 motion in light of the sufficiency and nature of the evidence adduced at trial. (Id.)

The Court conducted a hearing on the Rule 33 motion on March 20, 2007. At the hearing, Geronimo argued that Goldstein effectively denied him his Fifth Amendment right to testify by failing to properly explain his rights to him and by failing to prepare him for trial. (Gov't Opp., Ex. B ("Rule 33 Hr'g Tr.") at 2.) Geronimo contended that he did not learn of his right to testify until two months after trial, when he read about the right to testify in the library. (Id. at 17-18.) Geronimo testified that he only discussed the possibility of testifying with Goldstein one time, three days before trial, and that the meeting lasted less than fifteen minutes. (Id. at 10-11.) Geronimo stated that at this meeting, he told Goldstein that he wanted to testify, but Goldstein said that he would not put Geronimo on the stand because it would not be important. (Id. at 10-11.) Geronimo conceded, however, that Goldstein never told him that he could not testify. (Id. at 33.) Geronimo went on to state that, at trial, Goldstein made every

8

decision unilaterally and that Geronimo was not able to weigh in because he was unable to fully understand the proceedings due to inadequate translation services. (Id. at 12.)

On cross-examination, Geronimo stated that if he had testified at trial, his testimony would have been that he had a fight with his wife and went to stay at his mother's house on January 12, 2006, and that Rodriguez came to his mother's house to ask Geronimo for a ride. (Id. at 41-42.) Rodriguez told Geronimo that his car was not working and that he needed a ride to Long Island. (Id. at 42.) Geronimo testified that although he did not normally stay at his mother's house, Rodriguez must have known he was there that day "by chance." (Id. at 45.) Geronimo said that he then gave Rodriguez the key to his car, went to take a shower, and when he came downstairs Rodriguez was there with Veras, whom Geronimo had not previously met. (Id. at 42.) He testified that he did not see any money or partake in any of the conversations with Cartagena. (Id. at 43-44.)

The government then called Goldstein, who testified that he had met with Geronimo fifteen times prior to Geronimo's conviction. (Id. at 55.) Goldstein testified that he repeatedly discussed the prospect of a trial with Geronimo, especially during the six or seven meetings after Geronimo rejected the government's plea offer. (Id. at 55-57.) He testified that he informed Geronimo of his right to testify and that his partner practiced cross-examining Geronimo. (Id. at 58.) Goldstein stated that on at least three or four separate occasions he advised Geronimo not to testify. This advice was based on Goldstein's assessment that Geronimo's testimony would not be credible due to Geronimo's inability, during practice sessions, to provide reasonable explanations for several aspects of his story and his inability to answer even simple questions. (Id. at 58-59, 61-63.) Goldstein testified that he explained this reasoning to his client and that, after Goldstein provided this advice to Geronimo, Geronimo did not respond. (Id. at 62-63.)

Goldstein conceded that he did tell Geronimo that he couldn't testify, but that he told him this in the sense that doing so would harm his defense. (Id. at 66.)

At a status conference held on April 11, 2007, Geronimo again asked to have new defense counsel appointed, at which time Raymond Colon was relieved and Gary Villanueva was appointed as Geronimo's defense counsel. (See United States v. Geronimo, No. 06-CR-0087(CBA), D.E. # 199.)

The Court subsequently denied Geronimo's motion for a new trial because the Court credited Goldstein's testimony that he informed Geronimo of his right to testify and that Geronimo understood that he had the right to testify if he wished to. (See Mem. & Order, United States v. Geronimo, 06-CR-0087(CBA), D.E. # 200.) The Court further found that, even to the extent Geronimo argued that Goldstein erred in recommending that Geronimo not take the stand, it was an obvious strategic decision for which Goldstein provided sound reasons. (Id.)

On February 4, 2008, the Court sentenced Geronimo to 120 months imprisonment followed by five years of supervised release, and entered an Order of Forfeiture.

## IV. Direct Appeal

On February 25, 2008, Geronimo filed a Notice of Appeal with the Court of Appeals for the Second Circuit. On August 8, 2008, the Second Circuit ordered Geronimo to show cause why the appeal should not be dismissed for failure to file a brief by the June 2, 2008 deadline, and directed Geronimo to file a brief by August 22, 2008. On August 18, 2008, Geronimo's then-attorney Villanueva sought an extension of time to file a brief stating that there were no non-frivolous issues to raise on appeal pursuant to Anders v. California, 386 U.S. 738 (1967), because Villanueva needed additional time to have the Anders brief translated into Spanish for Geronimo.

On September 17, 2008—before Villanueva filed the <u>Anders</u> brief but apparently after he informed Geronimo that he planned to file one—Geronimo filed a <u>pro se</u> motion arguing that Villanueva was ineffective for not raising the following arguments on appeal (1) there was no probable cause to arrest Geronimo; (2) it was improper for a magistrate judge to conduct jury selection; and (3) Geronimo's trial counsel was ineffective in not arguing at trial that Agent Moran lied about a live transmission of the January 12, 2006 meeting, and about Geronimo's presence at a December 14, 2005 meeting. (Gov't Opp., Ex. F.) In his <u>pro se</u> motion, Geronimo requested an extension until December 21, 2008 to file an appeal as a self-representative, and permission for an individual identified as Posr A. Posr, an unlicensed attorney, to file a "friend of the court brief." (<u>Id.</u>)

One week later, on September 22, 2008, Villanueva filed an <u>Anders</u> brief asserting that there were no non-frivolous arguments to raise on appeal because (1) there was probable cause to arrest Geronimo; (2) the consent of Geronimo's trial counsel to jury selection before a magistrate judge was sufficient under the then-recently decided Supreme Court decision in <u>Gonzalez v. United States</u>, 128 S. Ct. 1765 (2008); (3) this Court did not abuse its discretion in denying Geronimo's Rule 33 motion; (4) even assuming Geronimo's Rule 29 motion for insufficient evidence was preserved for appellate review, there was sufficient evidence to sustain the jury's verdict; and (5) the sentence imposed was reasonable. (<u>See generally</u> Br. for Def.-Appellant Esteban Geronimo ("<u>Anders</u> Br."), <u>United States v. Geronimo</u>, 08-0190 (2d Cir. September 22, 2008).) Geronimo subsequently filed a motion essentially arguing that the Second Circuit should disregard Villanueva's <u>Anders</u> brief because it was filed after Geronimo's request to represent himself on appeal, and requesting that the Second Circuit rule on Geronimo's previous motion to

find appellate counsel ineffective. Geronimo also filed, on May 18, 2009, a motion for bail while the appeal was pending.

On September 3, 2009, the Second Circuit granted Villanueva's motion to withdraw, granted the government's motion for a summary affirmance, and denied Geronimo's pro se motions for bail pending appeal and for a finding of ineffective assistance of both his trial counsel and appellate counsel. (Gov't Opp, Ex. C.) Geronimo then petitioned the Supreme Court for a writ of certiorari, which the Supreme Court denied on March 8, 2010. (Gov't Opp, Ex. D.)

## V.    Federal Habeas Petitions

On March 7, 2011, Geronimo's friend Posr A. Posr filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255 on Geronimo's behalf. (See Geronimo v. Rushing, No. 11-CV-1121(CBA), D.E. # 2.) The Court rejected this motion as Posr did not have standing to file on Geronimo's behalf, but permitted Geronimo to file an amended petition within 30 days. Posr v. Rushing, No. 11-CV-1121(CBA), 2011 WL 1240560 (E.D.N.Y. Mar. 29, 2011). Geronimo submitted the instant petition on April 29, 2011 (the "Original Petition"), which is identical to the petition filed by Posr but is signed by Geronimo. (See Mem. of Law in Supp. of Mot. to Vacate ("Original Pet."), Geronimo v. Rushing, No. 11-CV-1121(CBA), D.E. # 6.) The Original Petition argues that (1) the police did not have sufficient probable cause to arrest Geronimo; (2) the grand jury proceedings were defective because they were based on misleading testimony; (3) it was unconstitutional for a magistrate judge to preside over jury selection; (4) Geronimo's trial counsel, Goldstein, was ineffective because he failed to inform Geronimo of his right to testify; (5) Goldstein was ineffective because he failed to show that the prosecution relied on false evidence; and (6) Geronimo's appellate counsel, Villanueva, was ineffective because he filed a

brief pursuant to <u>Anders v. California</u>, stating that there were no non-frivolous issues to raise on appeal.

Geronimo subsequently filed a second petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 on April 8, 2014 (the "Amended Petition"). (<u>See</u> Pet. for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 ("Am. Pet."), <u>Geronimo v. United States</u>, 14-CV-2221(CBA), D.E. # 1.) The Amended Petition makes many of the same arguments as those contained in the Original Petition. First, Geronimo re-asserts his arguments that a magistrate judge should not have presided over the jury selection process, although this claim is variously argued on the grounds that the Federal Magistrates Act is unconstitutional, and that Geronimo's trial counsel was ineffective in consenting to have a magistrate judge conduct jury selection. Geronimo further argues that he was received ineffective assistance of counsel from his trial counsel, Goldstein, but includes additional bases for this argument, including that trial counsel (1) failed to adequately investigate the case; (2) failed to show the jury that Agent Moran provided erroneous testimony during the suppression hearing; (3) failed to adequately cross-examine witnesses; (4) failed to make sufficient objections at trial; (5) failed to object to the admissibility of the audio recording of the January 12, 2006 meeting; (6) failed to give the jury instruction; and (7) failed to make a motion for a judgment of acquittal, for a new trial, or to set aside the verdict. In addition, this second petition appears to assert three entirely new arguments alleging errors on the part of this Court at trial, including that the Court (1) erred in denying the petitioner's request for new counsel; (2) failed to make any ruling as to the admissibility of co-conspirator statements; and (3) erroneously admitted "prior acts" evidence.

## DISCUSSION

### I.  The Amended Petition

#### A.  The Amended Petition Is Properly Construed as a Motion to Amend Geronimo's Original Petition

Although Geronimo's Amended Petition is characterized as a § 2241 petition, "[i]t is well-settled that a court may convert a § 2241 petition to a § 2255 motion in appropriate circumstances." Ching v. United States, 298 F.3d 174, 176 (2d Cir. 2002) (citation omitted). Appropriate circumstances exist here to convert Geronimo's § 2241 petition to a § 2255 motion because the § 2241 petition challenges the constitutionality of his conviction and sentence on the basis that (1) it was unconstitutional for jury selection to proceed before a magistrate judge, (2) his trial counsel was ineffective, and (3) this Court denied his request for new counsel and improperly admitted certain evidence.  These are not proper grounds for a § 2241 motion, which "generally challenges the execution of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions." Jiminian v. Nash, 245 F.3d 144, 146 (2d Cir. 2001) (emphasis in original).  Even to the extent § 2241(c)(3) provides that federal courts may entertain habeas petitions from federal prisoners "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2241(c)(3), "as a general rule, federal prisoners must use § 2255 instead of § 2241(c)(3) to challenge a sentence as violating the Constitution or laws of the United States." Jiminian, 245 F.3d at 147. Accordingly, Geronimo's § 2241 petition will be construed as a second § 2255 petition.  Further, because this second petition was filed while Geronimo's initial § 2255 motion was pending, the Court will construe it as a motion to amend the initial § 2255 motion.  See Ching, 298 F.3d at 177 ("[I]n general, when a § 2255 motion is filed before adjudication of an initial § 2255 motion

14

is complete, the district court should construe the second § 2255 motion as a motion to amend the pending § 2255 motion.").

**B. Timeliness of the New Claims Pursuant to Fed. R. Civ. P. 15(c)**

The Amended Petition, however, was filed well after the expiration of the applicable one-year statute of limitations, see 28 U.S.C. § 2255(f)(1),[2] and the Court may therefore only consider the new claims to the extent they "relate back" to the claims alleged in Geronimo's Original Petition within the meaning of Federal Rule of Civil Procedure 15(c). See Ching, 298 F.3d at 181 ("Under Rule 15(c), an amendment is timely if it 'relates back' to the original habeas petition." (citation omitted)). An amendment relates back if it asserts "a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). The Supreme Court has stated that "[s]o long as the original and amended [habeas] petitions state claims that are tied to a common core of operative facts, relation back will be in order." Mayle v. Felix, 545 U.S. 644, 664 (2005).

As discussed above, several of the claims in the Amended Petition are identical or substantially similar to the claims raised in the Original Petition regarding ineffective assistance of counsel and the propriety of a magistrate judge presiding over jury selection. Even to the extent Geronimo makes slightly new arguments regarding the ways in which his trial counsel was allegedly deficient, the government concedes that "liberally construed" the new ineffective assistance of counsel claims arise from the same common core of operative facts, and should therefore be considered by this Court. (See Mem. of Law in Opp. to Am. Pet. to Vacate

---

[2] To the extent Geronimo argues that the judgment is not yet final because his habeas petition is still pending (see Pet'r's Reply, No. 14-CV-2221(CBA), D.E. # 7), the Court notes that the one year statute of limitations for filing a habeas petition under § 2255(f)(1) begins to run from the date on which the judgment of conviction becomes final. A judgment of conviction becomes final "when the United States Supreme Court denies the prisoner's petition for a writ of certiorari." Green v. United States, 260 F.3d 78, 84 (2d Cir. 2001). Accordingly, the statute of limitations expired here on March 8, 2011—one year after the Supreme Court denied Geronimo's petition for a writ of certiorari. (See Gov't Opp., Ex. D.)

Conviction ("Gov't Opp. to Am. Pet."), Geronimo v. United States, 14-CV-2221(CBA), D.E. # 6 at 10.)

The Court, however, finds that the entirely new challenges regarding the Court's conduct during trial do not relate back to the Original Petition. Geronimo's claims that the Court erred in denying his request for new counsel, failed to make any ruling as to the admissibility of co-conspirator statements, and erroneously admitted evidence of "prior acts," are wholly unrelated to the claims in his Original Petition because none of the claims in his Original Petition alleged error on the part of the Court during trial. Importantly, the mere fact that these new claims and the claims in the Original Petition are all based on Geronimo's trial is not sufficient to establish that they arise from a common core of operative facts. See Mayle, 545 U.S. at 664 (rejecting petitioner's "translation of same 'conduct, transaction, or occurrence' to mean same 'trial, conviction or sentence'"); see also Thristino v. United States, 379 F. Supp. 2d 510, 518 (S.D.N.Y. 2005) (finding that new claims contained in habeas petitioner's second petition regarding "the constitutionality of the Court's treatment of his prior convictions" did not relate back to the claims in his original petition regarding ineffective assistance of counsel). The Court therefore declines to consider these untimely claims.[3] Even if the Court were to consider Geronimo's untimely claims, they would be denied as meritless for the reasons set forth in the government's brief. (See Gov't Opp. to Am. Pet. at 16-18.)[4]

---

[3] Geronimo's argument that the statute of limitations should be equitably tolled is unavailing. "Equitable tolling is only appropriate in 'rare and exceptional circumstances' where, despite a petitioner's reasonable diligence, 'extraordinary circumstances beyond [the petitioner's] control prevented successful filing during [the required] time.'" Ottenwarde v. United States, No. 12-CV-6537(JGK), 2013 WL 1242632, at *5 (S.D.N.Y. Mar. 28, 2013) (quoting Baldayaque v. United States, 338 F.3d 145, 151 (2d Cir. 2003)). Geronimo has made no attempt to establish that extraordinary circumstances prevented him from including the newly asserted claims in his Original Petition, which was timely filed.

[4] With respect to Geronimo's argument that the Court erred in denying his request for new counsel, as noted by the government the factual basis for this assertion is unclear, given that the Court repeatedly granted Geronimo's requests for new counsel. To the extent Geronimo seeks to challenge the Court's denial of his request to be represented by Posr in connection with his initial § 2255 habeas petition, this argument has no bearing on whether

## II. The Mandate Rule

Turning to the claims that were timely filed, the government argues that several of Geronimo's claims are barred by the "mandate rule," which in the § 2255 context "bars re-litigation of issues already decided on direct appeal." Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) (citations omitted). Specifically, the government argues that the following claims were raised and decided on appeal: (1) that it was unconstitutional for the magistrate judge to preside over jury selection; (2) that there was no probable cause to arrest Geronimo; and (3) that trial counsel was ineffective in not arguing that Agent Moran lied about the defendant's presence at a December 14, 2005 meeting. (Gov't Opp. at 16.) On appeal, Geronimo argued that his appellate counsel was ineffective for failing to argue his appeal on these three grounds, and the Second Circuit denied his pro se motion for a finding of ineffective assistance of appellate counsel. (Gov't Opp., Ex. C.)

Although these three claims were previously styled as ineffective assistance of counsel claims, in his pro se motion to the Second Circuit Geronimo argued the merits of these three grounds to show that his appellate counsel was ineffective for failing to raise them on appeal. (See Gov't Opp., Ex. F.) Given that the three claims currently before the Court in Geronimo's habeas petition are predicated on the same factual grounds as the claims he raised on appeal, he is barred from relitigating those claims. See Yick Man Mui, 614 F.3d at 56 (stating that the mandate rule "bars the raising in a habeas proceeding of a claim when the events underlying the claim were the same as those underlying a claim raised and decided on the merits on direct

---

Geronimo's sentence violates the Constitution or laws of the United States, 28 U.S.C. § 2255, or whether he is in custody in violation of the Constitution or laws of the United States, 28 U.S.C. § 2241. In any event, the Court notes that "a prisoner has no constitutional right to counsel on a § 2255 petition." Reid v. United States, No. 13-CV-5308(ARR), 2014 WL 4101507, at *4 (E.D.N.Y. Aug. 15, 2014) (citing Pennsylvania v. Finley, 481 U.S. 551, 555 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions. . . . Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further.")).

appeal"); United States v. Pitcher, 559 F.3d 120, 124 (2d Cir. 2009) (finding that argument made in § 2255 petition was barred by previous direct appeal because the instant argument, although slightly different from argument made on direct appeal, "was premised on the same facts and rest[ed] on the same legal ground"). In any event, the Court also finds these previously litigated claims to be without merit, as discussed below.

### III. Geronimo's Claims Fail on the Merits

Even assuming that several of Geronimo's claims are not barred by the mandate rule, he would not be entitled to habeas relief based on those claims or his remaining claims. Pursuant to 28 U.S.C. § 2255, a federal prisoner can seek post-conviction relief in cases where the sentence: "(1) was imposed in violation of the U.S. Constitution or the laws of the United States; or (2) was entered by a court without jurisdiction to impose the sentence; or (3) exceeded the maximum detention authorized by law; or (4) is otherwise subject to collateral attack." Adams v. United States, 372 F.3d 132, 134 (2d Cir. 2004) (citing 28 U.S.C. § 2255). Relief is limited to circumstances in which there was a genuine "constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Cuoco v. United States, 208 F.3d 27, 30 (2d Cir. 2000) (internal quotation marks and citation omitted).

#### A. Probable Cause

Geronimo challenges his conviction on the basis that the police lacked probable cause to arrest him. (Original Pet. at 5.) At the outset, to the extent Geronimo attempts to argue that the facts in the initial complaint do not support a finding of probable cause, the Court notes, as it did during the suppression hearing, that because the arrest was made at the scene the relevant facts in determining probable cause were those known the arresting officers at the time of the arrest, not what was stated in the complaint. (See Suppression Hr'g Tr. at 28-29.) "Probable cause to arrest

a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." United States v. Valentine, 539 F.3d 88, 93 (2d Cir. 2008) (internal quotation marks and citation omitted).

As established during the suppression hearing, the police had abundant probable cause to arrest Geronimo on January 12, 2006. During the hearing, DEA Agent Moran testified that, on the day of Geronimo's arrest, the confidential informant, Cartagena, had arranged to meet with several individuals to receive a $50,000 down payment for 20 kilograms of cocaine. (Suppression Hr'g Tr. at 9.) Agent Moran further testified that the informant was to call Agent Moran when the individuals had arrived with the money. (Id.) He testified that a silver Saturn registered to Geronimo arrived in the parking lot to meet the informant, and that another member of the DEA field team subsequently saw Geronimo open the trunk of the car. (Id. at 10-11.) Agent Moran then received the prearranged call from the informant and his team proceeded to arrest Geronimo and his co-conspirators. (Id. at 11.) The money for the transaction was found in the trunk of Geronimo's car. (Id. at 12.)

Moerover, to the extent Geronimo argues that Detective Moran erroneously testified during the suppression hearing that Cartagena was wearing a wire through which Detective Moran could hear what was happening contemporaneously, the record of the suppression hearing shows that Detective Moran clearly testified as follows:

| [Defense counsel]: | Is it fair to assume that on January 12th, there was also a recording made by that same informant? |
|---|---|
| [Moran]: | That is correct. |

19

| [Defense counsel]: | Is it also fair to assume that you listened to that recording at some point in time, correct? |
|---|---|
| [Moran]: | Yes. |
| [Defense counsel]: | Were you listening to that recording contemporaneously or did you listen to it at some later date? |
| [Moran]: | Some later date. |
| [Defense counsel]: | What date did you listen? And we are talking about the day of the arrest, January 12th, so there is no confusion. When did you listen to that recording? |
| [Moran]: | Subsequently. Sometime subsequently. I don't know the exact date. |

(Id. at 24.) Although Detective Moran later provided somewhat inconsistent testimony about the type of device Cartagena was wearing and whether Detective Moran could hear the events contemporaneously, (see id. at 38), that does not change the important facts that Geronimo's trial counsel acknowledged were not in dispute—namely that, at the time of Geronimo's arrest, the agents knew that (1) Geronimo was with at least one other individual who was previously involved in a drug deal, and (2) Geronimo had payment for the kilograms of cocaine in the trunk of his car, in the amount of $29,990. (Id. at 45.) Based on the facts adduced at the July 17, 2006 hearing, the agents who arrested Geronimo had sufficient knowledge to believe that Geronimo was committing a crime at the time of his arrest.

## B. Alleged Defect in Grand Jury Proceedings

Geronimo further argues that his conviction should be vacated because "the grand jury proceedings were impaired by, at best, misleading testimony" regarding his presence at earlier meetings among his co-conspirators.[5] (Original Pet. at 5, 20-22.) Geronimo's Original Petition

---

[5] The Court notes that this claim may be barred by the procedural default rule because Geronimo could have, but did not, raise it on direct appeal. See United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011) ("In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct

contains an alleged excerpt of Detective Moran's grand jury testimony in which Detective Moran stated that the confidential informant had confirmed the three individuals arrested on January 12, 2006 were the individuals he had been meeting with, and that all of the recordings of the meetings confirmed what the confidential informant's description of the previous meetings. (Id. at 22.) The Court understands Geronimo's argument to be that Detective Moran falsely represented during his grand jury testimony that Geronimo was at the December 14, 2005 and January 10, 2006 meetings between Cartagena and Veras.

Generally, conviction by a jury renders harmless any errors in the grand jury proceeding. See United States v. Mechanik, 475 U.S. 66, 70 (1986) ("[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt."); see also Cordero v. United States, No. 09-CV-4388(SAS), 2010 WL 4507771, at *4 (S.D.N.Y. Nov. 8, 2010) ("It is well settled that alleged errors in grand jury proceedings are not cognizable on federal habeas corpus review because [p]etitioner was convicted by a jury after trial." (alteration in original) (citation omitted)). Although neither Geronimo nor the government has provided the Court with the actual transcript of the grand jury proceedings, even assuming that there was misleading grand jury testimony regarding Geronimo's presence at the previous meetings, this error was rendered harmless by the subsequent conviction of Geronimo. This conviction established that Geronimo

---

appeal."). The government, however, did not argue that this claim is procedurally defaulted. Given that that the doctrine of procedural default is not jurisdictional, but rather prudential, the Court will consider this claim on the merits. See United States v. Doe, 66 F. App'x 249, 252 (2d Cir. 2003) (citing Kuhali v. Reno, 266 F.3d 93, 101 (2d Cir. 2001) ("It is well-settled that the doctrine of procedural default is prudential rather than jurisdictional in nature.")).

was present at the January 12, 2006 meeting and was involved in the drug transaction. Accordingly, Geronimo's claim on this ground is denied.

## C. Jury Selection Before A Magistrate Judge

Geronimo also seeks to vacate his conviction on the ground that jury selection was referred to a magistrate judge. (Original Pet. at 10-16; Am. Pet. at 11.) Geronimo's arguments on this ground are not entirely clear, but the Court understands his arguments to be that (1) it was unconstitutional for a magistrate judge to preside over jury selection; (2) jury selection before a magistrate judge required Geronimo's consent, rather than the consent of his attorney; and (3) his trial attorney's consent to jury selection before a magistrate judge constituted ineffective assistance of counsel.

The Federal Magistrates Act permits district courts to assign magistrate judges certain identified duties, as well as "such additional duties as are not inconsistent with the Constitution and laws of the United States." 28 U.S.C. § 636(b)(3). "[S]upervision of voir dire in a felony proceeding is an additional duty that may be delegated to a magistrate under 28 U.S.C. § 636(b)(3) if the litigants consent." Peretz v. United States, 501 U.S. 923, 935 (1991). The Supreme Court has made clear that "[t]here is no constitutional infirmity in the delegation of felony trial jury selection to a magistrate when the litigants consent," noting that "a defendant has no constitutional right to have an Article III judge preside at jury selection if the defendant has raised no objection to the judge's absence." Id. at 936. In Gonzalez v. United States, the Supreme Court held that it is sufficient if counsel alone consents to a magistrate judge's supervision of jury selection, rather than the defendant. 553 U.S. 242, 253 (2008).

It is undisputed that Geronimo's trial counsel consented to having Magistrate Judge Orenstein preside over jury selection. (Jury Selection Tr. at 5.) This consent alone was

sufficient, even if Geronimo had no knowledge of the waiver discussion that took place during a sidebar discussion between Magistrate Judge Orenstein and counsel. See Gonzalez, 553 U.S. at 246 (stating that counsel's consent was sufficient even assuming "that the defendant did not hear, or did not understand, the waiver discussions"). Accordingly, Geronimo's argument that referral of jury selection to a magistrate judge was unconstitutional, or that jury selection before a magistrate judge required Geronimo's consent, is meritless.[6]

Moreover, trial counsel's consent to jury selection before Magistrate Judge Orenstein does not constitute ineffective assistance of counsel. Under Strickland v. Washington, 466 U.S. 668 (1984), a petitioner seeking to prevail on a claim of ineffective assistance of counsel must make two showings: (1) that counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms," Strickland, 466 U.S. at 688; and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," i.e., that the petitioner was prejudiced by counsel's deficient performance. Id. at 694; see also United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009). Geronimo fails to satisfy even the first prong of Strickland. As discussed above, counsel, rather than a defendant, may consent to a magistrate judge's supervision of jury selection. Indeed, the Supreme Court has explicitly stated that "acceptance of a magistrate judge at the jury selection phase is a tactical decision that is well suited for the attorney's own decision." Gonzalez, 553 U.S. at 250. Goldstein's conduct was therefore not objectively unreasonable.

---

[6] Geronimo's argument that the application of Gonzalez to his case "is in violation of Ex Post Facto laws" because Gonzalez was decided after Geronimo's trial, (Original Pet. at 16), is without merit. The Ex Post Facto Clause of the Constitution prohibits legislation that "imposes a punishment for an action which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." DiNapoli v. Northeast Reg'l Parole Comm'n, 764 F.2d 143, 145 (2d Cir. 1985) (internal quotation marks and citations omitted). Although there are "limitations on ex post facto judicial decision making [that] are inherent in the notion of due process," Rogers v. Tennessee, 532 U.S. 451, 456 (2001), the Gonzalez decision—which relates to the consent required for a magistrate judge to conduct jury selection—does not relate to the imposition of punishment.

See, e.g., United States v. DeCecco, 467 F. App'x 85, 89 (2d Cir. 2012) ("It is well established that 'actions or omissions that might be considered sound trial strategy do not constitute ineffective assistance.'" (quoting United States v. Berkovich, 168 F.3d 64, 67 (2d Cir. 1999))). Even assuming Geronimo could satisfy the first Strickland requirement, he fails to make any assertion that having Magistrate Judge Orenstein preside over jury selection prejudiced him in some way.

## D. Ineffective Assistance of Counsel

In addition to alleging that his trial counsel was ineffective for consenting to jury selection before a magistrate judge, Geronimo makes a number of ineffective assistance of counsel claims against both his trial counsel, David Goldstein, and his appellate counsel, Gary Villanueva. Geronimo fails to substantiate his claims.

### 1. Ineffective Assistance of Counsel Claims Against Geronimo's Trial Counsel

#### a. Alleged Failure to Investigate

Geronimo argues that Goldstein was ineffective because he failed "to conduct an adequate pretrial investigation," and specifically failed to "investigate exculpatory or alibi evidence that would have shed significant doubt on the Government's case in the form of credible, documentary evidence." (Am. Pet. at 11.) Although counsel does have a duty to investigate, that duty does not "compel defense counsel to investigate comprehensively every lead or possible defense . . . or to scour the globe on the off-chance something will turn up." Greiner v. Wells, 417 F.3d 305, 321 (2d Cir. 2005) (internal quotation marks and citations omitted). Moreover, "[a] petitioner alleging that counsel's ineffectiveness was centered on a supposed failure to investigate has the burden of providing the court sufficiently precise information, that is, a comprehensive showing as to what the investigation would have

produced." Halo v. United States, No. 06-CV-5041(ARR)(RLM), 2007 WL 1299158, at *13

(E.D.N.Y. Apr. 30, 2007) (citation omitted); see also Petrucelli v. United States, No. 05-CV-

9582(TPG), 2009 WL 4858081, at *10 (S.D.N.Y. Dec. 15, 2009) ("Where allegations

of ineffective assistance are conclusory and give no indication as to what exculpatory evidence

may have been revealed by an investigation, a Sixth Amendment ineffective assistance claim

based on failure to investigate is doomed."). Here, beyond Geronimo's conclusory assertions

that Goldstein did not conduct an adequate investigation, he has made no attempt to show what

evidence further investigation would have produced. He alleges that Goldstein should have

further investigated exculpatory or alibi evidence, but does not explain what specific

"exculpatory or alibi evidence" he believes existed that Goldstein failed to identify. Geronimo's

claim on this ground is therefore denied.

### b. Alleged Failure to Allow Geronimo to Testify

Geronimo argues that Goldstein provided ineffective assistance of counsel by allegedly

denying him the right to testify. Specifically, Geronimo contends that at the Rule 33 hearing,

Goldstein admitted that he told Geronimo "you can't testify" and that, although Goldstein

testified at the hearing that he said this to Geronimo in the sense that he shouldn't testify because

he was not credible, Geronimo did not understand this context. (Original Pet. at 22.)

"An attorney's obligation to provide effective assistance includes the responsibility to

inform the defendant of the nature and existence of his right to testify." United States v.

Noorzai, 953 F. Supp. 2d 499, 507 (S.D.N.Y. 2013) (citing Brown v. Artuz, 124 F.3d 73, 78-79

(2d Cir. 1997)). Accordingly, "any claim by the defendant that defense counsel has not

discharged the responsibility—either by failing to inform the defendant of the right to testify or

by overriding the defendant's desire to testify—must satisfy the two-prong test established in

<u>Strickland v. Washington</u> for assessing whether counsel has rendered constitutionally ineffective assistance." <u>Brown</u>, 124 F.3d at 79.

Here, Goldstein's advice to Geronimo that he should not testify did not fall below an objective standard of reasonableness. At the Rule 33 hearing, Goldstein established that he advised Geronimo that he had a right to testify in his own defense and discussed with him on several occasions whether Geronimo thought he should testify. (Rule 33 Hr'g Tr. at 58-59.) Indeed, Goldstein testified that Geronimo understood that if he wanted to testify, he had the right to do so. (<u>Id.</u> at 65-66.) After practicing Geronimo's cross-examination, however, Goldstein advised Geronimo on several occasions that he should not testify because he did not provide reasonable explanations for several things and had a difficult time answering even simple questions. (<u>Id.</u> at 58, 61.) It was in this context that Goldstein told Geronimo that he could not testify—Goldstein explained that "I did tell him you can't testify but not that you are not legally permitted to testify. When I said you can't testify I said because nobody's going to believe you. . . ." (<u>Id.</u> at 66.) After Goldstein advised Geronimo not to testify, Geronimo did not say anything in response. (<u>Id.</u> at 62.) Moreover, Goldstein testified that when meeting with Geronimo, he spoke to him in Spanish and Geronimo never indicated that he had difficulty understanding him. (<u>Id.</u> at 56.)

Given Goldstein's assessment that Geronimo should not testify because of his inability to credibly answer questions, his advice to Geronimo not to testify was reasonable and therefore does not constitute ineffective assistance of counsel. <u>See</u> <u>Andrickson v. Brown</u>, No. 05-CV-4506(ARR), 2007 WL 1704133, at *7 (E.D.N.Y. June 12, 2007) (stating that "counsel's advice not to testify . . . is one of the defense 'decisions that fall squarely within the ambit of trial strategy, and, if reasonably made, cannot support an ineffective assistance of counsel claim.'"

(quoting United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992))). Indeed, as this Court noted after the Rule 33 hearing, Geronimo's testimony during that hearing corroborated Goldstein's assessment. (See Mem. & Order, 06-CR-0087(CBA), D.E. # 200 at 5 ("Goldstein provided sounds reasons for advising the defendant not to testify including the lack of a reasonable explanation for the actions he took as well as the fact that his story changed and he had difficulty answering questions. Goldstein's assessment was reinforced by the testimony provided by Geronimo at the hearing which amply reflected these deficiencies.").) To the extent Geronimo alleges he did not understand the context in which Goldstein told him he "could not testify," that claim is belied by Goldstein's testimony that he told Geronimo he had the right to testify and that they discussed the issue of Geronimo testifying on numerous occasions.

### c. Allegation Regarding Questioning of Agent Moran and Detective Marquardt

Geronimo further asserts that "a minimally competent attorney would have made clear to a jury which surveillance officer supplied [D]et. Marquart [sic] with the false information that Mr. Geronimo's car was in Long Island on December 14th, 2005." (Original Pet. at 6-7.) Although this claim is not entirely clear, the Court understands it to assert that Goldstein provided ineffective assistance by not questioning Agent Moran or Detective Marquardt at trial about Agent Moran's incorrect testimony during the suppression hearing. During that hearing, Agent Moran testified that surveillance units observed Geronimo's silver Saturn at the December 14, 2005 meeting between Veras and Cartagena. Specifically, when asked during cross-examination if he had seen the silver Saturn at the December 14, 2005 meeting, Agent Moran testified that "other officers did" and that he received the information from "surveillance officers[,] Detective Paul Marquardt." (Suppression Hr'g Tr. at 18.) Notably, Geronimo's Saturn was only observed on the date of his arrest, January 12, 2006, but Agent Moran promptly

realized his error and stated that this testimony was erroneous. (Id. at 20.) Moreover, when asked why his notes made reference to seeing a silver Saturn on December 14, 2005, he explained that he made an error in his notes, which he had put together only for purposes of the hearing. (Id.)

To the extent Geronimo argues that Goldstein should have asked either Agent Moran or Detective Marquardt about this erroneous suppression hearing testimony, Goldstein's failure to pursue this line of questioning at trial during direct or cross-examination does not constitute ineffective assistance of counsel. It is well-established that decisions that fall "'within the ambit of trial strategy . . . if reasonably made,' cannot support an ineffective assistance claim." United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992) (citation omitted). Moreover, "[d]ecisions about 'whether to engage in cross-examination, and if so what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim." Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002) (quoting United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987)). Here, it was reasonable for Goldstein not to ask Agent Moran about the erroneous testimony elicited at the suppression hearing because Agent Moran almost immediately corrected himself during the hearing and it is not apparent what this line of questioning would have accomplished, except to show that Agent Moran briefly confused the date on which Geronimo's car was observed. Similarly, there was no reason to ask Detective Marquardt about Agent Moran's erroneous testimony because, as conceded by Agent Moran, Detective Marquardt did not in fact tell him that Geronimo's Saturn was observed at the December 14, 2005 meeting. Accordingly, Goldstein's failure to question the witnesses on this immaterial issue did not constitute ineffective assistance of counsel. See, e.g., Feliciano v. United States, No. 01-CV-9398(PKL), 2004 WL 1781005, at *5 (S.D.N.Y. Aug. 10, 2004)

(finding that counsel's failure to call two witnesses who "would have at best impeached the government's cooperating witnesses' testimony on collateral issues" did not constitute ineffective assistance of counsel).

### d. Alleged Failure to Adequately Cross-Examine Witnesses

In his Amended Petition, Geronimo also generally alleges that Goldstein's "cross-examination of the witnesses was limited to the fact [that] they pled guilty and were lying solely to get a reduced sentence." (Am. Pet. at 3.) To the extent Geronimo argues that this alleged failure to adequately cross-examine witnesses constituted ineffective assistance of counsel, as noted above, decisions about how to conduct cross-examination generally do not support an ineffective assistance of counsel claim. Dunham, 313 F.3d at 732.

Moreover, the record belies this claim. Goldstein engaged in a vigorous cross-examination of each of the government's witnesses, and his questioning of Cartagena and Veras went well beyond solely attempting to show that Cartagena, as a paid informant, and Veras, as a cooperating witness, had an incentive to lie about the events of January 12, 2006. Indeed, in cross-examining Cartagena and Veras, Goldstein elicited, among other things: (1) conflicting testimony as to how the trunk was opened, in an attempt to establish that Geronimo was not the individual who opened the trunk to show Cartagena the money for the transaction, (see Trial Tr. at 219-21, 322-24); (2) conflicting testimony as to what Geronimo did while Cartagena was counting the money, again in an attempt to show that Geronimo was not the individual who showed the money to Cartagena, (see id. at 224-25, 326); and (3) testimony that Veras took other individuals to meetings with Cartagena not because they were involved in the drug transaction but rather because he needed a ride, in an attempt to show that Geronimo was only at the meeting on January 12, 2006 because Veras and Rodriguez needed a ride, (see id. at 294-96).

Geronimo's claim that Goldstein failed to adequately cross-examine the witnesses at trial therefore has no basis in the record.

### e. Alleged Failure to Make Objections at Trial

Geronimo further alleges that Goldstein failed to object to questions or testimony, and asserts that Goldstein "failed to make more than one objection during the entire trial." (Am. Pet. at 11.) As an initial matter, Geronimo's claim has no basis in the record, as Goldstein continually objected to the government's questioning of witnesses. (See, e.g., Trial Tr. at 37, 38, 54, 129, 141, 172, 255, 264, 266, 279.) Even assuming that Goldstein did not make every possible objection during trial, "[i]n order to succeed on a claim that counsel was ineffective by failing to object, a petitioner must posit a meritorious objection." Wolfson v. United States, 907 F. Supp. 2d 418, 423 (S.D.N.Y. 2012) (finding that petitioner's claim that counsel "should have objected more at trial" was insufficient to show counsel was ineffective because petitioner did not "point to any meritorious objection that his counsel failed to make."). Geronimo has made no attempt to explain what specific objections Goldstein should have made to questions or testimony, and his claim on this basis is therefore denied.[7]

### f. Allegations Related to Audio Recording of January 12, 2006 Meeting

At trial, the government introduced an audio recording and corresponding transcript of the January 12, 2006 meeting between Cartagena, Veras, Rodriguez and Geronimo, which was recorded by paid informant Cartagena. The government alleged that Geronimo could be heard on the recording saying "in five and five" when he was explaining to Cartagena how the money for the transaction was packaged. Geronimo argues that he was "never in those recordings" and

---

[7] Geronimo makes the conclusory assertion that "counsel failed to object to rule 404(b) evidence." (Am. Pet. at 11.) He does not explain, however, what this alleged evidence was and, indeed, the Court can find no reference in the record to evidence of other acts that the government admitted to prove Geronimo's "character in order to show that on a particular occasion [he] acted in accordance with the character." Fed. R. Evid. 404(b)(1).

Goldstein was therefore ineffective because he (1) failed to object to the government's introduction of the January 12, 2006 audio recording at trial, and (2) failed to introduce the recording as evidence and discredit it. (Am. Pet. at 3.)

As discussed above, "[i]n order to succeed on a claim that counsel was ineffective by failing to object, a petitioner must posit a meritorious objection." Wolfson v. United States, 907 F. Supp. 2d 418, 423 (S.D.N.Y. 2012). Although Geronimo is correct that Goldstein did not object to the admissibility of the January 12, 2006 audio recording, (see Trial Tr. at 113-14), an objection to the admissibility of the audio recording on the basis that Geronimo allegedly did not speak on the recording would not have been meritorious. The government alleged that Geronimo's voice could be heard on the recording and, in order to support this assertion, questioned Cartagena about the various speakers on the recording. Specifically, the government asked Cartagena about the portion of the recording and corresponding transcript in which Cartagena asked "how does it come," to which an unidentified male ("UM2") responded "in five and five." (Id. at 170.) Cartagena testified that he was asking how the money was organized, and that Geronimo was the individual who replied "in five and five." (Id. at 170; see also id. at 171 ("[M]y testimony is that the defendant said it to me.").) Accordingly, Geronimo's assertion that his voice was not in fact on the recording went to the weight to be given to the tapes, not their admissibility, and any objection regarding the admissibility of the tapes would have failed. See United States v. Tropeano, 252 F.3d 653, 660-61 (2d Cir. 2001) (finding audiotapes of recorded telephone conversations between defendant and other individuals were admissible when the other individuals with "firsthand knowledge of the conversations . . . each identified the voices on the tapes," but that defendant was still "free to challenge the tapes' reliability by, for example, cross-examination of the [individuals] concerning their familiarity with [defendant's]

voice and the tape recording system" which went "to the weight to be given to the tapes by the jury, not their admissibility").

Moreover, Geronimo's claim that Goldstein did not attempt to discredit the recording is belied by the record. Goldstein cross-examined Cartagena about his recollection that Geronimo was the individual on the recording. (Trial Tr. at 222-23.) In addition, Goldstein questioned the translator who had identified the individual who said "in five and five" as unidentified male 2 ("UM2"), and the translator testified that he knew it was someone other than Veras or Cartagena because the individual had a higher pitched voice. (Id. at 104.) Goldstein subsequently called Geronimo's wife as a witness to establish that Geronimo never spoke in a high-pitched voice. (Id. at 396.) Then, during summations, Goldstein argued that the voice on the recording was not Geronimo's voice. (Id. at 461.) Accordingly, Geronimo has failed to show that Goldstein's representation on this basis fell below an objective standard of reasonableness.

### g. Allegations Regarding Jury Instructions

Geronimo appears to argue that Goldstein was ineffective because he "failed to give the jury instruction." (Am. Pet. at 2.) In response, the government argues that this claim fails because to the extent Geronimo asserts that Goldstein should have personally instructed the jury, it is the responsibility of the Court to instruct the jury. (Gov't Opp. to Am. Pet. at 15.) Moreover, to the extent Geronimo asserts that Goldstein failed to request a specific jury instruction, the government argues that this claim also fails because Geronimo did not specify any jury instruction that should have been requested. (Id.) Geronimo subsequently filed a response to the government's brief in an attempt to clarify his argument on this ground, in which he argues that this claim is based "on the failure to transcribe jury instructions." (Pet'r's Reply at 3.) It is unclear how this claim relates to Goldstein's effectiveness at trial. In any event, the trial

transcript contains a complete record of the jury instructions provided by the Court. (Trial Tr. at 492-514.) Geronimo's claim on this basis is therefore denied.

> h.     <u>Alleged Failure to Move for a Judgment of Acquittal, for a New Trial, or to Set Aside the Verdict</u>

Geronimo alleges that "at no time did Attorney Goldstein make an oral or written motion for judgment of acquittal, a new trial, or to set aside the verdict." (Am. Pet. at 4.) Notably, "[f]or purposes of effective assistance, not every possible motion need be filed, but rather, only those having a solid foundation." <u>Castillo v. United States</u>, No. 10-CV-2976, 2010 WL 3912788, at *11 (S.D.N.Y. Sept. 8, 2010) (quoting <u>United States v. Nersesian</u>, 824 F.2d 1294, 1322 (2d Cir. 1987)). A motion for a judgment of acquittal may be made at the close of the government's case and will be granted for "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant may also make a motion for a judgment of acquittal to set aside a verdict, or renew a motion for judgment of acquittal, within fourteen days after a guilty verdict on the grounds the evidence was insufficient to sustain a guilty verdict. Fed. R. Crim. P. 29(c). "A defendant challenging the sufficiency of the evidence underlying his conviction 'bears a very heavy burden.'" <u>United States v. Sierra</u>, 923 F. Supp. 2d 501, 502 (S.D.N.Y. 2013) (quoting <u>United States v. Gonzalez</u>, 110 F.3d 936, 940 (2d Cir. 1997)). With respect to motions for a new trial, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

At the outset, the Court notes that, as with many of Geronimo's claims, his claim finds no basis in the record. At the close of the government's case, Goldstein moved for a judgment of acquittal pursuant to Rule 29(a), which the Court denied. (Trial Tr. at 377-78.) To the extent Geronimo argues that Goldstein was ineffective for failing to renew the motion for acquittal after the jury returned a guilty verdict, this alleged failure did not constitute ineffective assistance of

counsel given the heavy burden that a defendant must satisfy on a Rule 29 motion and the fact

that the Court had already denied defendant's Rule 29(a) motion at the close of the government's

case. Indeed, Geronimo's second attorney, Colon, represented to the Court at the time he made

the Rule 33 motion that he would not make a Rule 29 motion in light of the sufficiency and

nature of the evidence adduced at trial. (See United States v. Geronimo, 06-CR-0087(CBA),

D.E. # 161.) Moreover, to the extent Geronimo argues that Goldstein was ineffective for failing

to file a motion for a new trial pursuant to Rule 33, Geronimo cannot satisfy the prejudice prong

of Strickland on this basis because his second attorney, Colon, did file a Rule 33 motion alleging

that Goldstein provided ineffective assistance of counsel. This Court ultimately denied

Geronimo's Rule 33 motion. Geronimo's ineffective assistance of counsel claims against

Goldstein are therefore denied.

  2. Ineffective Assistance of Counsel Claims Against Geronimo's Appellate Counsel

  Geronimo also argues that his appellate counsel, Villanueva, was ineffective because he

filed an Anders brief with the Second Circuit stating that there were no non-frivolous grounds for

appeal. Although not entirely clear, Geronimo appears to claim that Villanueva should have

argued on appeal that it was unconstitutional for a magistrate judge to preside over jury selection.

(Original Pet. at 4.)

  Pursuant to Anders v. California, if counsel finds a case to be "wholly frivolous . . . he

should so advise the court and request permission to withdraw," which must "be accompanied by

a brief referring to anything in the record that might arguably support the appeal." Anders v.

California, 386 U.S. 738, 744 (1967). "The Court of Appeals of the Second Circuit will not

grant an Anders motion unless it is satisfied that: (1) 'counsel has diligently searched the record

for any arguably meritorious issue in support of his client's appeal;' and (2) 'defense counsel's

declaration that the appeal would be frivolous is, in fact, legally correct.'" Torres-Cuesta v.

United States, No. 09-CV-0091(SJ), 2010 WL 3928588, at *7 (E.D.N.Y. Sept. 30, 2010) (quoting United States v. Burnett, 989 F.2d 100, 104 (2d Cir. 1993)). Importantly, "[t]he filing of an Anders brief does not in itself constitute ineffective assistance of counsel." Ulloa v. United States, No. 10-CV-4409(DLI), 2013 WL 5530680, at *6 (E.D.N.Y. Sept. 30, 2013) (citations omitted).

Here, Villanueva complied with the requirements of Anders and filed a comprehensive brief that thoroughly discussed the relevant proceedings and the possible arguments on appeal. This included an analysis of whether the consent of Geronimo's counsel to jury selection by a magistrate judge was sufficient, or whether Geronimo was required to give his own consent. Similar to the analysis set forth above, Villanueva concluded that the Supreme Court's decision in Gonzalez v. United States, 553 U.S. 242 (2008), foreclosed the argument that the defendant must give his own consent for a magistrate judge to preside over jury selection. (See Anders Br. at 24-25.) By granting Villanueva's motion, the Second Circuit indicated that Villanueva's declaration that the appeal, including arguments based on jury selection, would be frivolous was legally correct. Accordingly, Geronimo's claim that Villanueva was ineffective for failing to appeal on this ground fails.

To the extent Geronimo argues that Villanueva's filing of an Anders brief denied him of his "substantial and procedural due process right not to have had attorney Villanueva's Anders brief submitted . . . because Mr. Geronimo had already motioned for his right to self-represent," (Original Pet. at 5), that argument is similarly unavailing. The filing of an Anders brief did not preclude Geronimo from making pro se submissions to the Second Circuit. Indeed, Anders requires "[a] copy of counsel's brief . . . be furnished the indigent and time allowed him to raise any points he chooses." Anders, 386 U.S. at 744. Here, Villanueva complied with Anders and

informed Geronimo, in both English and Spanish, of his right to "request assistance of other counsel, or submit pro se response papers (pro se means representing yourself)." (See Anders Br. at 51-52.) Geronimo submitted pro se motions both before and after Villanueva filed the Anders brief, which were considered, and denied, by the Second Circuit. (See Gov't Opp., Ex. C.) Accordingly, Geronimo's claim on this basis is denied.

## CONCLUSION

For the foregoing reasons, the Court converts Geronimo's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 to a second § 2255 petition and, because his initial § 2255 petition was pending at the time the second petition was filed, construes it as a motion to amend his initial § 2255 petition. Further, the Court denies his petitions to vacate his conviction pursuant to 28 U.S.C. § 2255. Because Geronimo has failed to make a "substantial showing of the denial of a constitutional right," a Certificate of Appealability shall not issue. 28 U.S.C. § 2253. The Clerk of Court is directed to close the cases docketed as 11-CV-1121(CBA) and 14-CV-2221(CBA).

SO ORDERED.

Dated: September 17, 2014
      Brooklyn, NY

                                      s/Carol Bagley Amon
                                      Carol Bagley Amon
                                      Chief United States District Judge